Filed 9/7/16  P. v. Mays CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MARTELL MAYS,<br><br>Defendant and Appellant. | A141844<br><br>(Contra Costa County<br>Super. Ct. No. 1311125) |

A jury found defendant Martell Mays guilty of second degree robbery and assault with a firearm, both with an enhancement for personal use of a firearm.  He appeals, asserting two claims of ineffective assistance of counsel, one claim of abuse of discretion relating to the use of his prior convictions for impeachment purposes, and one claim of instructional error.  Defendant's arguments all lack merit, and we affirm.

**EVIDENCE AT TRIAL**

Around 5:30 p.m. on April 30, 2013, Raymond Gonzales was standing outside a laundry room at the Belmont Apartments, an apartment complex in Pittsburg where he lived.  He was talking to one of his neighbors, Pablo Nieves, who lived in one of the apartments near the laundry room.  As they stood there, Gonzales saw defendant walk back and forth past them at least three times.  Defendant gave Gonzales "mean" and hostile looks that made him uncomfortable.  Defendant was wearing a black hood over his head, which made Gonzales suspicious because it was warm outside.  Gonzales got a good look at defendant's face as he stared at him.

1

The fourth time defendant walked by, he approached Gonzales. When he was about two feet away, he pulled out a gun, pointed it at Gonzales's face, and demanded his wallet. Gonzales, who could see defendant's eyes as he stood in front of him with the gun, was in shock and did not react right away. Before he could take out his wallet, defendant hit him with the gun in his temple and the back of his head. Gonzales fell to the ground, and defendant again demanded his wallet. Gonzales attempted to retrieve it from his back pocket, but before he could get it out, defendant reached over, grabbed it, and fled.

Although Gonzales did not recognize defendant at the time of the robbery, he later realized he had seen him three days earlier, again at the apartment complex when Gonzales was doing laundry and defendant asked him if he had any change.

At trial, Gonzales recounted that when he spoke with a police officer shortly after the robbery, he described the assailant as a Black man about six feet tall, 160 pounds with short hair. He testified that because the assailant was wearing a hood, it was hard to see his hair, but Gonzales "kind of figured he had short hair because it wasn't puffed up or nothing." On cross-examination, he did not remember whether the assailant had any facial hair, although he had testified at defendant's preliminary hearing that the assailant had a thin mustache and goatee.[1]

Gonzales did not tell the police that the assailant had walked back and forth nearby and looked at him in a mean way. At trial, he explained that was because he was not in a position to talk, given all the emergency responders who were tending to him and were telling him he needed to go to the hospital.

Police officers later returned to Gonzales's apartment and showed him a photo lineup. Gonzales was unable to identify the assailant, explaining at trial that he "wasn't sure" because he was "not too good picking out pictures." And at the time he was shown the photo lineup, he was suffering nosebleeds, a buzz in his ears, and headaches. At trial, Gonzales was shown a photo lineup similar to the one the police showed him after the

_____

[1] At the preliminary hearing, defendant in fact had a thin mustache and goatee.

2

robbery, and he agreed that the photograph of defendant looked similar to how defendant looked in court that day and that he had been unable to identify defendant from that photo.

When Gonzales testified at defendant's preliminary hearing, he identified defendant as the man who had robbed and assaulted him. Gonzales explained at trial that he had been able to identify defendant in person but not the photo lineup because it made a difference looking at a live person rather than a photograph. He denied at trial that he identified defendant at the preliminary hearing because he was the only Black man in the room, confirming he identified defendant as the assailant because he was confident he was the man who robbed him. He also explained that when he was originally shown the photo lineup, he was "kind of nervous" and still in shock from the robbery and assault. Gonzales acknowledged on cross-examination that when he testified at the preliminary hearing, he believed the police had found the person who had committed the robbery, that they had the right person in court that day.

Gonzales acknowledged at trial that when he was interviewed by the police, he did not tell them that he had seen defendant three days earlier when he had asked for change. He explained that it was not until he saw defendant in court at the preliminary hearing that he remembered he had seen him three days before the assault. When asked why he did not mention at the preliminary hearing that he had seen defendant three days before the robbery, Gonzales answered, "Well, . . . I just didn't think it was important."

Gonzales also testified on cross-examination that he had "just seen [defendant] around the apartments" on occasion. He testified at the preliminary hearing, however, that he did not remember if he had seen defendant walking around the apartment complex. And he did not know if he testified at the preliminary hearing that he had never talked to defendant except at the time of the robbery.

At trial, Gonzales looked closely at defendant and was confident he was the assailant. He did not want the wrong person convicted, and he would have said if it was not defendant. He denied that he may have gotten the man who asked him for change confused with the man who robbed him.

3

Pablo Nieves also testified at trial. According to Nieves, on the day of the robbery he and Gonzales were talking outside the laundry room at the Belmont Apartments. Nieves was about five feet away from his apartment door; the front door was open and the security gate was closed. As the two were talking, defendant, who was wearing a dark sweatshirt with the hood on his head, walked past them three or four times. Nieves did not notice him stare at them or look at them hostilely. The next time defendant passed by, however, he aggressively walked up to them and pulled out a gun from underneath his sweatshirt. Nieves froze in shock, and the next thing he knew, defendant put the gun up to Gonzales's head and told him not to move. He also told Nieves not to move. Defendant said to Gonzales, "Give me your fucking wallet," and then grabbed the wallet out of Gonzales's pocket. There was a brief scuffle when Gonzales grabbed the gun from his head, but defendant overpowered Gonzales and struck him in the head with the gun.

Nieves quickly turned around and ran into his apartment. As he was running, he saw a piece of the gun break off and land near his door. He went into his apartment and told his "wife"[2] there was a man outside with a gun and to call the police. He grabbed their children and ran to the back bedroom, while his wife went over to the door to see what was going on.

Nieves was interviewed by Pittsburg Police Officer Gabriel Palma a few minutes after the robbery. He described the assailant as an African American man wearing a dark blue hooded sweatshirt and light blue shorts, between 30 and 40 years old, over six feet tall, with short hair. He told the officer he had seen the man around the apartment complex.

At trial, Nieves denied he told Officer Palma that defendant turned to him and said, "I don't have a problem with you, so get the fuck out of here" and that Nieves then walked slowly toward the inside of his apartment. Nieves also denied he told the officer

[2] Sayra Callejas described Nieves as her fiancé.

4

that he heard defendant demand Gonzales's wallet as he was slowly walking towards his apartment.

The morning after the robbery, Nieves and Callejas went to the Pittsburg Police Department to view a photo lineup. According to Nieves, he and his wife were in a room together, and Nieves spoke to Officer Palma while his wife spoke to another officer. Officer Palma first showed the lineup card to Nieves, who identified a photograph of defendant as the assailant, circling defendant's photo and putting his signature above the circle. When asked at trial how sure he was when he viewed the photo lineup that defendant was the assailant, Nieves testified, "Oh, I know for sure it was him."

According to Nieves, Officer Palma then showed Callejas the photo lineup. He could not hear what she was saying or whether she identified anyone. Despite this, he testified, "She did her part. She's like, Yeah, that's him right there. She circled her part, her initials, too, so we both did it at the same time." He and his wife talked about the fact that they identified the same photo.

Nieves testified that he had seen defendant before walking around the apartment complex, but he did not know him. He estimated he had seen him 12 times in the two to three months before the incident. When defendant walked up to them, Nieves "recognized him real good" from having seen him around.

Nieves also testified that seeing defendant in court that day, he was certain he was the assailant.

Callejas testified that she was at home in the kitchen when Nieves ran in and said, "Hey, there's a guy in front with a gun." She closed the door, looked through the peephole in the door, and saw Gonzales on the ground and a man holding a gun. Gonzales put his hands up as if to say "calm down," and reached into his pocket to retrieve his wallet. He gave it to the man, who then fled. She opened the door to check on Gonzales, grabbed something for his bleeding head wound, and called the police. She did not see the assailant strike Gonzales, but when she went outside to check on him, he told her he had hit him.

5

Callejas testified that the assailant was wearing a black sweater with a hood covering his face. He was Black, but she was unable to see his face or hair because of the hood. He was "pretty tall," at least six feet. She was unable to estimate his age because she had not seen his face, and she could not say how much he weighed, although she described him as "a pretty heavy guy," "a pretty solid man," "a big guy." At trial, she did not remember telling the police that the assailant may have been 25 to 30 years old, that he might have weighed 200 pounds, or that he was wearing black shorts.

According to Callejas, the day following the incident, she and Nieves went to the police station, where an officer led them to a room to look at a photo lineup. Callejas was shown the pictures, but she told the officer she could not identify the assailant since she never saw his face. He then showed the pictures to Nieves, and she saw him point to a picture of who he believed to be the assailant. The officer then circled that photo.

Pittsburg Police Officer Juan Simental was the first officer to arrive at the Belmont Apartments in response to a call regarding the robbery. According to Officer Simental's trial testimony, he found Gonzales, who was upset and in shock about what had happened, bleeding from cuts on the bridge of his nose and above his left eye. About 10 minutes after assessing Gonzales, Officer Simental took a statement from him. Gonzales said he was talking to Nieves, and the assailant walked by at least once and looked at him. The man then walked up to him, pulled out a gun, pointed it at his chest, and demanded his wallet. When Gonzales was on the ground, he was reaching for his wallet, but the assailant reached down and pulled it out of Gonzales's pocket. Gonzales did not mention that he had grabbed the gun and struggled with the assailant over it.

Gonzales had described his attacker as a Black male, approximately six feet tall, 230 pounds, wearing a black hooded sweatshirt and shorts, with short hair and no facial hair. Gonzales told the officer he did not know the man and had never seen him before.

Either the day of or the day after the robbery, Officer Simental spoke to Pittsburg Police Officer Richard Hosier, who told him he had seen defendant at the apartment complex the morning of the robbery wearing clothing similar to that described by Gonzales. Based on that, defendant was identified as a suspect, and Officer Simental

6

included his photograph in a photo lineup he prepared for Gonzales. According to the officer, the lineup was computer-generated and included five other subjects who were similar to defendant in facial features, race, height, weight, and facial hair. He was satisfied the photos were reasonable and appropriate subjects for a comparison lineup. When shown the photo lineup, Gonzales was unable to identify his assailant, stating that he could not positively identify anybody.

Officer Simental testified that he read Gonzales the standard admonishment concerning photo lineups, had him sign the admonishment form, attached it to the lineup card, and logged the form and lineup card into evidence at the Pittsburg Police Department. At the time he first took the stand, he believed the records were still in evidence. In looking at the photo lineup Officer Palma showed Nieves, Officer Simental did not think it was the same photo lineup he showed Gonzales. He thought, however, they both included the same photograph of defendant.

Officer Simental was later recalled to the stand. He testified that during a break, he had returned to the police department to look for the photo lineup card he had shown Gonzales. It had not been recorded on the evidence log for that case, there was no indication he had placed the lineup card into evidence, and he was unable to find it. He believed he had not in fact placed it into evidence despite a notation in his report that he did, and further believed that he did not save the witness admonishment form signed by Gonzales. He admitted he should have placed the lineup card into evidence.

Officer Palma testified that he arrived at the apartment a few minutes after receiving the call about the robbery. Officer Simental was already there, tending to Gonzales, so he turned his attention to Nieves and his wife. As Nieves described it to Officer Palma, he and Gonzales were talking when defendant walked up, removed a black semiautomatic firearm from his waistband, and pointed it at Nieves, telling him, "I don't have a problem with you, so get the fuck out of here." Defendant then pointed the gun at Gonzales. Nieves walked slowly toward the front door of his apartment, which was about 15 feet away. Before he went into his apartment, he heard defendant demand Gonzales's wallet and strike him with the gun. He did not mention that Gonzales

7

grabbed the gun, that there was any scuffle, or that he saw a piece come off the gun. Nieves told Officer Palma that the assailant was someone he had seen around the apartment complex and he would recognize him if he saw him again.

Officer Palma then spoke with Callejas. She told the officer that Nieves came into the apartment and they closed the door, and through the peephole she saw the assailant take Gonzales's wallet. She did not get a good look at the assailant's face because she saw him from the side, but she said he was wearing a black hooded sweatshirt with the hood pulled over his head.

Officer Palma later asked Nieves and Callejas to come to the station to view a photo lineup. He read them the lineup admonishment together, and then showed Nieves the lineup card while Callejas was waiting outside. Nieves made an identification, circling defendant's picture on the card and saying he was absolutely certain it was him. He then left the room and Callejas came in. Officer Palma did not show Callejas the photo card on which Nieves had written, nor did Nieves have an opportunity to tell her he had made an identification. Callejas was unable to make an identification, telling Officer Palma she did not get a good look at the assailant's face.

Officer Palma could not say if Officer Simental had used the same photo lineup. He did not keep the lineup card he showed Callejas because it was the same as the one he showed Nieves and she did not make an identification.

Officer Hosier testified that on the day of the robbery, he was assigned to the Pittsburg Police Department's municipal code enforcement division and, as a result, had frequent contact with the Belmont Apartments. That day, the manager of the complex contacted him about a man who was coming onto the property and causing problems. Officer Hosier went to the complex, where he saw the man—defendant—from a distance wearing dark clothing. Mid-afternoon that same day, he encountered defendant, who was wearing a black hooded sweatshirt and black shorts, standing in front of the laundry room. The officer was familiar with defendant from prior contacts, and he knew that defendant's girlfriend and the mother of his child was a tenant in one of the apartments.

8

The following day, Officer Hosier encountered Officer Palma in the report writing room. Officer Palma mentioned the robbery and the description of the assailant. When Officer Hosier heard the size of the assailant, he immediately suspected defendant, whom the officer described as "a good size man. He's over six feet and over 200-something pounds and he stands out." That description did not fit anyone else he had come into contact with at the apartment complex, and he told Officer Palma about his suspicion.

Defendant testified on his own behalf. He testified that in April 2013, he was living at the Belmont Apartments, where he shared a room in an apartment with his wife and daughter. When asked what he was doing on April 30, defendant testified that he did not remember, although he thought he was probably at the apartment with his family. He then testified that he encountered Officer Hosier that morning, claiming, "He tried to get me to stay away from where I stay at with my wife and kids. And I just wouldn't leave the premises because he was harassing me for no reason because earlier in April . . . he was arresting officer for my probation violation and he was harassing me." When asked to explain how he knew he had encountered Officer Hosier if he did not remember where he had been that day, defendant explained that Officer Hosier had testified that they spoke that day so defendant was "going by his testimony."

Defendant denied that he committed the robbery and that he even owned a firearm. He recognized Gonzales from having seen him walking his dogs around the Belmont Apartments a couple of times every week over the year defendant had lived there, but the only conversation he ever had with Gonzales was about a month before the robbery when he was at the Belmont store and asked Gonzales for some change to buy a cigarette. He recognized Callejas from having seen her around the complex, but he did not know Nieves.

Defendant did not recall what he was wearing on April 30, but he denied he was wearing a black hooded sweatshirt and black shorts, testifying, "I don't even own a pair of shorts or a hooded sweater. I try to make a fashion statement when I dress." According to defendant, Officer Hosier was lying when he testified that he saw defendant

9

wearing a black hooded sweatshirt and shorts that day, and the officer, Gonzales, and Nieves were all wrong in identifying him as the culprit.

On cross-examination, defendant admitted the following prior convictions: petty theft in 2008, two counts of felony theft in October 2009, two counts of second degree burglary in February 2011 (unspecified as to whether they were felonies or misdemeanors), felony burglary in September 2011, and felony grand theft from a person in March 2012.

## PROCEDURAL BACKGROUND

Defendant was charged with second degree robbery (Pen. Code, § 211/212.5[3]) and assault with a firearm (§ 245, subd. (a)(2)), both counts also alleging that he personally used a firearm (§§ 12022.5, subd. (a), 12022.53, subd. (b)). It was also alleged that he was ineligible for probation (§ 1203.3) or jail (§ 1170, subds. (f), (h)(3)(A)).

Following a jury trial, defendant was found guilty of both counts together with the commensurate weapons use allegations. He was sentenced to 13 years in state prison.

Defendant timely appealed.

## DISCUSSION

### A. Defendant Has Not Shown that His Trial Counsel was Ineffective for Failing to Seek Sanctions for the Loss of the Photographic Lineup Shown to Gonzales

Defendant's first argument asserts a claim for ineffective assistance of counsel pertaining to the apparent loss of the photo lineup that Officer Simental showed Gonzales the day after the robbery. As defendant explains it, "Contrary to the initial testimony of Officer Simental, the lineup that he produced and showed to Gonzales mysteriously disappeared despite the fact the officer had written in his report that it had been lodged into evidence. Given the fact that Gonzales could not identify his assailant from that lineup, which included a recent photograph of [defendant], the loss of that lineup constituted either the loss or destruction of evidence which the officer readily admitted might have been exculpatory. Although defense counsel argued that the loss of this

---

[3] All statutory references are to the Penal Code except where otherwise noted.

10

evidence called into question the identification of [defendant] by the witnesses, in that at least initially, Gonzales has been unable to identify his assailant, counsel made no effort to sanction the prosecution for the loss of this evidence. Nor did she even request jury instructions requesting that the jury draw adverse inferences from the loss of this evidence. Both would have been appropriate remedies in this case. By failing to do so, trial counsel was ineffective and that ineffectiveness was prejudicial to [defendant's] claim of being misidentified." This argument lacks merit.

In *People v. Mackey* (2015) 233 Cal.App.4th 32, 119, we recently summarized the well-established standard for a successful ineffective assistance of counsel claim: "A defendant claiming ineffective assistance of counsel must demonstrate both deficient performance and resulting prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 691–692 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216–218.) On the first prong he must show that 'counsel's representation fell below an objective standard of reasonableness . . . [¶] . . . under prevailing professional norms.' (*Strickland, supra,* at p. 688.) And under the second, he must show that in the absence of the error it is reasonably probable that a result more favorable to him would have been obtained. A reasonable probability is 'a probability sufficient to undermine confidence in the outcome.' (*Id.* at p. 694.)" Where defendant fails to show prejudice, we may reject a claim of ineffective assistance of counsel without reaching the issue of deficient performance. (*Id.* at p. 697.) We need not reach the issue of deficient performance because defendant has failed to show that he was prejudiced by the loss of the photo lineup card.

Officer Simental described the process by which photos are selected for a lineup and testified that the card he showed Gonzales would have contained the most recent photo of defendant accessible to the police department. After that, defense counsel and Officer Simental engaged in this exchange:

"MS. GRAY: Was Mr. Mays' photo in your lineup appropriate for him as to age?

"OFFICER SIMENTAL: I believe so, yes.

"MS. GRAY:   You didn't use a picture of him, for example, when he was 12 and had braces on?

"OFFICER SIMENTAL:   Correct.

"MS. GRAY:   It's a picture that looks reasonably similar to what you expected him to look like in April of 2013?

"OFFICER SIMENTAL:  Yes."

Officer Simental also testified that he believed he used the same photo that Officer Palma used in the photo lineup shown to Nieves and Callejas.  The jury was thus told that the photo of defendant in the lineup was recent picture that looked like defendant at the time of the robbery, and a copy of that photo was introduced into evidence via Officer Palma's lineup card.  And Gonzales testified that when he was shown the photo lineup containing a photograph of defendant, he was unable to identify defendant as his assailant.  We fail to see the significance of the photo lineup card itself in light of this evidence.

Further, defendant has not demonstrated that sanctions would likely have been granted.  The court in *People v. Zamora* (1980) 28 Cal.3d 88, identified the factors that guide the trial court's exercise of its "discretion in determining the appropriate sanction that should be imposed because of the destruction of discoverable records and evidence." (*Id.* at p. 99.)  The court explained:

"First, 'the imposition and mode of sanctions depends upon the particular circumstances attending such loss or destruction.'  [Citation.]  Thus lawful and proper destruction requires no sanction [citations]; illegal and malicious suppression of evidence may result in dismissal [citations].

"Second, the sanction depends on the materiality of the evidence suppressed.  In *Hitch* [*People v. Hitch* (1974) 12 Cal.3d 641], for example, we noted that bad faith destruction of evidence which might conclusively demonstrate innocence could require dismissal.  [Citation.]  Suppression of evidence which might impeach a witness for bias, however, may result in a new trial instead of a dismissal [citation]; suppression of evidence immaterial to the charge invokes no sanction [citation].

"Finally, the courts must consider the impact of the sanction upon future cases and future police conduct. If a sanction is to deter suppression of records and evidence, it must contain a punitive element; it must outweigh the benefit that the prosecution gains from the suppression. At the same time the court must bear in mind the public interest in law enforcement, and the harm which may be inflicted by a sanction which prevents the trial and conviction of possibly guilty future defendants." (*Zamora, supra,* 28 Cal.3d at p. 100.)

Applying these criteria here, we can only conclude that the trial court would not have granted a defense request for sanctions. The lost evidence was largely immaterial given the testimony of Officer Simental, Gonzales, and Nieves. And nothing suggested its loss was intentional. Quite simply, this was not the "crucial" evidence defendant makes it out to be.

Lastly, defendant makes this prejudice argument: "[H]ad [defendant] been afforded effective assistance of counsel, and the jury instructed, for example, at the very least, that it should assume that Gonzales' identification at the preliminary hearing and at trial should be distrusted in that he could not identify [defendant] from a lineup which accurately depicted his current appearance, and, further, that that failure suggested that Nieves' identification could have been erroneous as well, there was a significant likelihood that a more favorable verdict may have been rendered by the jury." We fail to see how the absence of the lineup card shown to Gonzales had any bearing on the reliability of Nieves's identification of defendant in the photo lineup the day after the robbery and in person at trial.

**B. The Trial Court Did Not Abuse Its Discretion by the Manner in Which It Permitted the Prosecutor to Impeach Defendant with Prior Convictions**

**1. Background**

In a pretrial motion in limine, the prosecutor sought to introduce evidence of defendant's "felonious offenses and/or crimes of moral turpitude" for impeachment purposes. Specifically, she identified the following convictions:
(1) 11/24/08—misdemeanor petty theft (§ 484/488); (2) 10/22/09—felony theft

13

(§ 484/666); (3) 10/22/09—felony theft (§ 484/666); (4) 2/16/11—misdemeanor second degree burglary (§ 459/460, subd. (b)); (5) 2/16/11—felony second degree burglary (§ 459/460, subd. (b)); (6) 2/16/11—felony obstructing or resisting a peace officer (§ 69); (7) 9/27/11—felony second degree burglary (§ 459/460, subd. (b)); and (8) 3/28/12—felony grand theft from a person (§ 487, subd. (c)).

Defendant opposed the motion, his counsel arguing that such impeachment would impair defendant's "ability to receive a fair trial by introducing evidence of bad character." Alternatively, she argued that under Evidence Code section 352, the court should limit the number of convictions the prosecutor could use and preclude discussion of the underlying facts. Counsel was "particularly concerned" with defendant's February 2011 conviction for obstructing or resisting a peace officer, which she considered "quite inflammatory," and his March 2012 conviction for grand theft from a person. With respect to the latter, counsel stated, "[I]f it's limited to simply a reference to that felony title, I don't have a problem with it. If the People intend to highlight the similarities to robbery, then I would object under 352 that it starts to serve a secondary purpose of showing character for the similar offense and I would have problem with that."

The prosecutor responded that defendant's grand theft from a person conviction was the result of plea negotiations in what started as a robbery prosecution, adding, "If the facts of that case become relevant based on how the defendant testifies, then I would be asking the Court to permit the People to introduce more information in regards to that."

The court ruled:

"I tend to agree that [section] 69 is somewhat inflammatory; and under Evidence Code section 352, I will grant the defense motion to exclude reference to it.

"But with regard to the others, I think that the fact of the conviction, the title of the offense is sufficient, unless the People have good reason to go into the facts of the March 28th offense and that it's raised outside the presence of the jury, and they get the go ahead, they're not to discuss anything about the facts of the case or that it was originally charged as a [robbery]."

In response to a request by defense counsel to exclude the misdemeanor convictions under Evidence Code section 352, the court ruled, "I'm not going to exclude it. I don't think that the time frame is so remote, it goes back—if the whole point to permitting this is moral turpitude, the length of time is significant for the jury to make that assessment and, therefore, going back to 2008 seems appropriate for a 2013 offense, so that's four-and-a-half years from the first conviction to the offense date."

Against that background, when defendant testified at trial, the prosecutor conducted the following cross-examination:

"MS. TAKHAR-DHILLON [the prosecutor]: Isn't it true that you make a living by stealing from people?

"MS. GRAY [counsel for defendant]: Objection, your Honor. Improper character.

"THE COURT: Sustained.

"MS. TAKHAR-DHILLON: Have you ever stolen anything from anyone?

"DEFENDANT: Stole . . . like, have I . . .

"MS. GRAY: Objection. Vague.

"THE COURT: Overruled.

"MS. TAKHAR-DHILLON: You can answer.

"DEFENDANT: Have I ever stole something from anybody?

"MS. TAKHAR-DHILLON: Um-hum.

"DEFENDANT: Yes, I have.

"MS. TAKHAR-DHILLON: When?

"MS. GRAY: Objection. Vague. Irrelevant.

"THE COURT: Overruled.

"MS. TAKHAR-DHILLON: You can answer.

"DEFENDANT: Well, I never stole. I stole from a store before, some security guard tried to snatch something and I ran out the door. I snatched [it] away so it got charged as a grand theft person.

15

"MS. TAKHAR-DHILLON:   Isn't it true that in November of 2008, you were convicted of petty theft?

"DEFENDANT:   Yeah, I steal from stores.

"MS. TAKHAR-DHILLON:   Isn't it also true that in October of 2009, you were convicted for felony theft?

"DEFENDANT:   Petty with a prior, bumped up.

"MS. TAKHAR-DHILLON:   As a felony, correct?

"DEFENDANT:   Yeah.

"MS. TAKHAR-DHILLON:   And in that same month, you also suffered another felony conviction for theft, correct?

"DEFENDANT:   For theft or petty theft?  Which one?"

"MS. TAKHAR-DHILLON:   Felony theft.

"DEFENDANT:   For—yeah, I stole from the store.

"MS. TAKHAR-DHILLON:   And on February 16th of 2011, you were convicted of second degree burglary, correct?

"DEFENDANT:   Stole from the store, again, bumped up.

"MS. TAKHAR-DHILLON:   And on that same day, you were convicted of a second second degree burglary, correct?

"DEFENDANT:   I stole from a store.

"MS. TAKHAR-DHILLON:   On September 27th of 2011, you were also convicted of a felony second degree robbery, correct?

"MS. GRAY:   Objection, your Honor—

"THE COURT:   Burglary.

"MS. GRAY:   —assumes facts not in evidence.

"THE COURT:   Sustained.  Rephrase.  You need to rephrase it.

"MS. TAKHAR-DHILLON:   I understand.  [¶] . . . [¶]

"On—in September of 2011, were you also convicted of a felony—

"DEFENDANT:   Stole—

"MS. TAKHAR-DHILLON:   —degree burglary?

16

"DEFENDANT: Stoled [*sic*] out of the store.

"MS. TAKHAR-DHILLON: And most recently, in March of 2012, you pled out to a felony grand theft from a person, correct?

"DEFENDANT: Stole from a store.

"MS. TAKHAR-DHILLON: Is that correct, though, isn't that what you pled out to?

"DEFENDANT: Yes."

### 2. Analysis

Defendant contends that in permitting the above exchange, the trial court abused its discretion, in the following four ways: (1) it improperly permitted the use of defendant's misdemeanor convictions for impeachment; (2) the prosecutor "exceeded the limitations placed by the trial court, by characterizing [defendant] as a thief"; (3) she failed to characterize one of the convictions as a misdemeanor rather than a felony; and (4) she improperly suggested defendant had a conviction for second degree robbery. There was no error.

As to the first concern, we do not agree that the trial court abused its discretion in allowing the prosecutor to impeach defendant with his misdemeanor convictions. The credibility of a witness, including a criminal defendant who testifies at trial, may be impeached not only with felony convictions (Evid. Code, § 788) but, subject to the trial court's exercise of discretion, with any acts of moral turpitude that might amount to conduct which resulted in a misdemeanor conviction. (*People v. Wheeler* (1992) 4 Cal.4th 284, 295–296.) The witness cannot be impeached with the *fact of* a misdemeanor conviction per se, but only of the underlying conduct. (*People v. Chatman* (2006) 38 Cal.4th 344, 373 ["Misdemeanor convictions . . . are not admissible for impeachment, although evidence of the underlying *conduct* may be admissible subject to the court's exercise of discretion."]; accord, *People v. Cadogan* (2009) 173 Cal.App.4th 1502, 1514.) Here, the court's ruling made clear that it permitted introduction of the facts underlying defendant's misdemeanors as they reflected his moral turpitude. In the

court's words, "the whole point to permitting this is moral turpitude." There was no error.

Defendant's next objection—that the prosecutor exceeded the limitations set by the court when she attempted to portray defendant as a thief—similarly lacks merit. The prosecutor's first question to defendant was, "Isn't it true that you make a living by stealing from people?" Defense counsel objected on the ground that this was improper character evidence, and the court sustained the objection. There can thus be no argument here that the court erred in this regard. The prosecutor then proceeded to ask defendant, "Have you ever stolen anything from anyone?" Defendant's counsel objected on vagueness grounds, which the trial court overruled. Having failed to object that this constituted prosecutorial misconduct (or error (*People v. Hill* (1998) 17 Cal.4th 800, 823)) or that it again was improper character evidence, defendant forfeited that argument on appeal. (*People v. Hall* (1986) 41 Cal.3d 826, 834, fn. 3; *People v. Green* (1980) 27 Cal.3d 1, 27.) Further, he cites no authority for his proposition that it was inappropriate for the prosecutor to ask, in the context of impeachment, if defendant had ever stolen anything. This question and defendant's answer ("Yes, I have.") were followed by defendant's admission that he had seven convictions for theft-related offenses. We do not understand how the prosecutor's question was improper.

Defendant's third complaint is that the prosecutor erred in failing to classify one of his second degree burglary convictions as a misdemeanor. In addition to a conviction for petty theft and three theft-related felonies, defendant also admitted three second degree burglary convictions. As to two of these, however, the prosecutor did not specify whether they were misdemeanors or felonies. Defense counsel did not object to this, however, which again forfeited this complaint. And we do not understand how, in the absence of an objection by counsel, this could have constituted an abuse of discretion by the trial court.

Lastly, defendant asserts the following: "Finally, in what was either an act of gross negligence or an intentional act, the prosecutor asked [defendant] whether he had ever been convicted of 'second degree robbery' in September 2011, even though the

18

prosecutor's own motion clearly showed that it was a burglary for which [defendant] was actually convicted." Defendant overstates what transpired, which was this:

"MS. TAKHAR-DHILLON: And on February 16th of 2011, you were convicted of second degree burglary, correct?

"DEFENDANT: Stole from the store, again, bumped up.

"MS. TAKHAR-DHILLON: And on that same day, you were convicted of a second second degree burglary, correct?

"DEFENDANT: I stole from a store.

"MS. TAKHAR-DHILLON: On September 27th of 2011, you were also convicted of a felony second degree robbery, correct?

"MS. GRAY: Objection, your Honor—

"THE COURT: Burglary.

"MS. GRAY: —assumes facts not in evidence.

"THE COURT: Sustained. Rephrase. You need to rephrase it.

"MS. TAKHAR-DHILLON: I understand.

"On—

"MS. GRAY: I ask the question be stricken.

"THE COURT: There is no answer.

"MS. GRAY: All right. Thank you.

"THE COURT: Go ahead.

"MS. TAKHAR-DHILLON: On—in September of 2011, were you also convicted of a felony—

"DEFENDANT: Stole—

"MS. TAKHAR-DHILLON: —degree burglary?

"DEFENDANT: Stoled [*sic*] out of the store."

As can be seen, the nefarious intent defendant attributes to the prosecutor is misplaced. This was an inadvertent slipup to which defense counsel immediately objected, which objection the court sustained, with the prosecutor then promptly correcting her mistake. Nothing more.

19

But even if we agreed with defendant's claim that the trial court committed error in the manner in which it allowed the prosecutor to impeach him, we would still not reverse on this ground. This is so because even assuming these errors, defendant has not demonstrated prejudice. There were still five theft-related felonies that the prosecutor could use to impeach defendant's credibility,[4] and there were two eyewitnesses who identified him as the assailant.

## C. Defendant's Counsel Was Not Ineffective in Failing to Seek Modification of CALCRIM No. 315

Defendant's third claimed error again asserts ineffective assistance of counsel, this time for his counsel's failure to seek modification of CALCRIM No. 315, the instruction on eyewitness identification. The instruction tells the jury that in evaluating identification testimony, it should consider a number of factors (in this case, 14 different factors, including how certain the witness was when he or she made an identification). Defendant cites "numerous scientific studies" in claimed support of his argument that "the certainty with which an eyewitness makes a purported identification of a suspect is unrelated to the accuracy of such an identification and can no longer be considered a reliable indication such a consideration [*sic*]." Based on this, defendant posits that CALCRIM No. 315 "improperly bolstered the testimony of witness Nieves who professed certainty in his identification of appellant, despite the problematic nature of the other evidence . . . ." As such, he concludes, his counsel's failure to seek modification of the instruction constituted ineffective assistance. We disagree.

As noted above, for a successful ineffective assistance of counsel claim, defendant must first show that his counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms. (*Strickland,*

---

[4] Defendant claims there may only have been four, arguing that the court "apparently never clarified whether [defendant] suffered one or two convictions for burglary on February 16, 2011 in Docket 4-166417-6. It certainly seems unlikely, and no proof provided in support of the prosecutor's pleading, that [defendant] was convicted of both a misdemeanor burglary and a felony burglary in the same action and on the same date." Defendant himself confirmed that it was two separate convictions, when he admitted the convictions during cross-examination.

*supra,* 466 U.S. at p. 688.)  Counsel's failure to make a motion that would have been futile cannot constitute deficient performance.  (*People v. Lewis* (1990) 50 Cal.3d 262, 289 ["Counsel may not be criticized for failing to bring a motion that would have been futile."].)  That was the case here, as a request to modify CALCRIM No. 315 would have been unsuccessful.

In *People v. Wright* (1988) 45 Cal.3d 1126, 1141 (*Wright*), the California Supreme Court expressly approved a version of CALJIC No. 2.92 (the predecessor to CALCRIM No. 315) that told the jury to consider the degree of certainty in assessing the reliability of eyewitness identification evidence.  "We hold that a proper instruction on eyewitness identification factors should focus the jury's attention on facts relevant to its determination of the existence of reasonable doubt regarding identification, by listing, in a neutral manner, the relevant factors supported by the evidence.  [¶] The instruction should *not* take a position as to the *impact* of each of the psychological factors listed."  (*Wright, supra,* 45 Cal.3d at p. 1141.)  Further, "the listing of factors to be considered by the jury will sufficiently bring to the jury's attention the appropriate factors, and . . . an explanation of the *effects* of those factors is best left to argument by counsel, cross-examination of the eyewitnesses, and expert testimony where appropriate."  (*Id.* at p. 1143.)

The California Supreme Court also upheld CALJIC No. 2.92 in *People v. Johnson* (1992) 3 Cal.4th 1183, 1230–1232.  When *Johnson* was issued, CALJIC No. 2.92 included among the factors the jury should consider in evaluating eyewitness identification testimony " '[t]he extent to which the witness was either certain or uncertain of the identification.' "  (*Johnson*, at pp. 1230–1231, fn. 12.)  *Johnson* rejected the defendant's contention that the trial court erred in instructing the jury that the extent to which the witness was either certain or uncertain of the identification was a factor to consider in assessing eyewitness identification testimony.  (*Id.* at pp. 1231–1232.)

The certainty factor in CALCRIM No. 315 is indistinguishable in substance from that set forth in CALJIC No. 2.92 and approved in *Wright* and *Johnson*.  And notwithstanding defendant's extensive reference to scientific studies concerning the lack

of correlation between certainty and accuracy in an eyewitness identification, we are bound by California Supreme Court precedent. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Furthermore, other cases issued after *Wright* and *Johnson* have rejected the argument defendant makes in this appeal. (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 561–562; *People v. Gaglione* (1994) 26 Cal.App.4th 1291, 1302–1303.) *Sullivan* stated: "As in *Gaglione*, we therefore 'reject defendant's arguments and find no error in CALJIC No. 2.92' as given with reference to degree of certainty as a factor in assessing the reliability of eyewitness identification testimony." (*Sullivan*, at p. 562.) We believe the holdings in those cases regarding the witness certainty factor in CALJIC No. 2.92 should likewise be applied to the trial court's instruction with CALCRIM No. 315 in this case. CALCRIM No. 315 does not require a jury to consider a witness's certainty or uncertainty. It does not make any correlation between the witness's level of certainty and accuracy of his or her identification. It does not imply witnesses are more believable if they are certain of their identifications. We thus conclude that a request by defendant's trial counsel to modify CALCRIM No. 315 would have been denied and counsel was thus not deficient in requesting a modification. Defendant's ineffective assistance of counsel claim fails accordingly.

### D. The Trial Court Did Not Err in Failing to Instruct the Jury on Grand Theft of the Person as a Lesser Included Charge of Robbery

In his final argument, defendant contends that the trial court had a sua sponte duty to instruct on grand theft from a person as a lesser included offense of robbery. We conduct an independent review of this claimed instructional error (*People v. Licas* (2007) 41 Cal.4th 362, 366; *People v. Waidla* (2000) 22 Cal.4th 690, 733, 737), and we conclude it lacks merit.

Robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211; CALCRIM No. 1600.) Grand theft from a person exists when the property is taken from the victim but without the use of force or fear. (§ 487; CALCRIM

22

No. 1801.)  Grand theft from a person is a lesser included offense of the crime of robbery. (*People v. Webster* (1991) 54 Cal.3d 411, 443.)  The trial court has a sua sponte duty to instruct on a lesser included offense where there is substantial evidence that the lesser crime was committed.  (*People v. Cooksey* (2002) 95 Cal.App.4th 1407, 1410–1411.)

Defendant claims that "the question of whether [defendant] had used the element of fear to achieve his goals was susceptible to two interpretations."  He goes on to explain this curious theory:  "Witness Nieves had testified that the assailant approached and without a word reached into Gonzales [*sic*] pocket.  While this testimony was contradicted by Gonzales who stated that the robber first demanded his property, his testimony was impeached in various ways.  The jury may well have believed Nieves's version over Gonzales'."  Nonsense.  Defendant completely ignores Nieves's testimony, consistent with that of Gonzales, that when defendant approached Gonzales, he pulled out a gun and pointed it at Gonzales's face, eventually striking him with it.  No possible interpretation of the evidence presented could support a conclusion that defendant did not use fear to achieve his goals.  In the absence of substantial evidence to support a grand theft of a person finding, there was no instructional error.

## DISPOSITION

The judgment of conviction is affirmed.

23

_____

Richman, J.

We concur:

_____

Kline, P.J.

_____

Stewart, J.

A141844; *P. v. Mays*

24